# SUPREME COURT OF THE UNITED STATES

## UNITED STATES *v.* DONTE J. CARTER

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT OF
COLUMBIA COURT OF APPEALS

No. 25–885.   Decided June 22, 2026

The petition for a writ of certiorari is denied.

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting from the denial of certiorari.

On a September afternoon in 2020, several plain-clothes police officers approached a group of black men who were lounging on a sidewalk. The officers were responding to an "'uptick in shootings and sounds of gunfire'" in that area. 341 A. 3d 1067, 1069 (DC 2025). Respondent Donte Carter was among the group.

An officer approached Carter and asked him if he was carrying a weapon. When Carter said "no," the officer asked, "[d]o you mind hiking your pants for me real quick?" App. to Pet. for Cert. 34a. As Carter complied, another officer standing a few feet away saw an L-shaped bulge in the front of Carter's pants. The officer pointed out the bulge, which Carter said was his phone. That officer nonetheless frisked Carter, and, after a brief struggle, the officers recovered a stolen firearm hidden among Carter's multiple pairs of compression shorts.

Carter was charged with firearm and theft offenses. He moved to suppress the gun and a statement that he had made after his arrest. He argued that the officer seized him in asking him to hike his pants and that the officer lacked reasonable suspicion or probable cause at that time. The D. C. Superior Court denied the motion.

The D. C. Court of Appeals (DCCA) reversed. After concluding that the officers' conduct did not enable the court to "objectively determine" whether Carter was seized, the

court—relying on its precedent—said that it "must look" to a further fact: the "defendant's race." 341 A. 3d, at 1076 (citing *Dozier* v. *United States*, 220 A. 3d 933, 944 (DC 2019)). The proper inquiry, the court stated, was "whether an objective and reasonable person sharing the defendant's generalized lived experiences arising out of their racial status"—that is, "sharing Mr. Carter's racial status as a Black man"—"would have felt free to terminate the police encounter." 341 A. 3d, at 1076. The court then discussed scholarship that in the court's view suggests that "Black men are more likely to comply with police demands rather than exercise their constitutional right to terminate a suspicionless police encounter." *Id.*, at 1078. And, the court said, the officer's request that Carter hike his pants was a seizure due to the "elevated effect" that the request "would have had on an objective and reasonable Black man in Mr. Carter's shoes." *Id.*, at 1080.

Judge McLeese concurred in the judgment. He remarked that the panel majority had appeared to give "dispositive weight" to Carter's race. *Id.*, at 1081. He also expressed "uncertainty as to whether the race of a suspect can permissibly be considered" in assessing whether a seizure occurred. *Ibid.*

The Government asks us to grant review. It argues that the decision below is inconsistent with established precedent on the question whether a person who is approached and asked questions by a police officer has been "seized" under the Fourth Amendment. Our precedent, the Government maintains, asks whether a "'reasonable person'" would feel that he or she is not free to end the conversation. *United States* v. *Drayton*, 536 U. S. 194, 201–202 (2002). In the Government's view, the injection of an individual's race into the "reasonable person" test contravenes our decisions. The Government also questions the reliability of the studies on which the DCCA relied, and it argues that the DCCA's

test will hamper legitimate and important police work in the District of Columbia.

I would grant the petition. The DCCA appears to be committed to the test that it used in this case, and the lawfulness of that test is an important question for both doctrinal and practical reasons. Under the test, officers will need to quickly assess a person's race, and if officers and courts must craft special rules for black persons, what about dark-skinned Latinos, other Latinos, and members of other minority groups?

We have said that our "'Constitution is color-blind.'" *Students for Fair Admission, Inc.* v. *President and Fellows of Harvard College*, 600 U. S. 181, 230 (2023). It "almost never" allows government actors to treat persons differently based on their race. *Louisiana* v. *Callais*, 608 U. S. \_\_\_, \_\_\_ (2026) (slip op., at 17). And we have rejected the proposition that the Constitution permits an individual to be treated differently based on a "perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike." *Shaw* v. *Reno*, 509 U. S. 630, 647 (1993). It is dangerous to allow an individual to be treated differently based on statistics, studies, or expert testimony that purports to show that members of the racial or ethnic group to which he belongs are more likely to act in a certain way than are members of other groups. Here, the special treatment helped the individual; in other situations it will not. See *Buck* v. *Davis*, 580 U. S. 100, 119 (2017).

Perhaps the DCCA's test has legitimate justifications. In any event, it is important, and it warrants this Court's review. I therefore respectfully dissent from the denial of certiorari.